RURAL PUBLISHING COMPANY, INC., Appellant, v. ADOLPH S. KATZMAN, Respondent.

First Department, May 27, 1921.

Landlord and tenant — summary proceedings for removal for non-payment of rent — lease construed not to include lot in rear of dwelling — entry constituting actual partial eviction not shown — constructive eviction no defense.

In summary proceedings for the removal of a tenant on the ground of non-payment of rent, lease examined and construed not to include the yard in the rear of the dwelling rented to the defendant or to preclude the plaintiff from erecting a building thereon.

No entry by the plaintiff constituting an actual partial eviction which would entitle defendant to remain in possession of the remainder of the premises without paying any rent was shown, and his defense to the proceedings based thereon was not sustained.

If there were a constructive eviction, which in this case could be predicated only on the increase in the noise and vibrations and interference with light and air as to all or part only of the premises, without an actual abandonment by the defendant, that would not be a defense to an action for rent.

APPEAL by the plaintiff, Rural Publishing Company, Inc., from an order and determination of the Appellate Term of the Supreme Court, First Department, entered in the office of the clerk of the county of New York on the 10th day of December, 1920, affirming a final order in summary proceedings rendered in the Municipal Court of the City of New York, Borough of Manhattan, Third District, in favor of the defendant.

*John Godfrey Saxe* [*M. Edward Kelley* with him on the brief; *Kelley & Connelly*, attorneys], for the appellant.

*Simon T. Stern*, for the respondent.

LAUGHLIN, J.:

This is a summary proceeding for the removal of a tenant on the ground of non-payment of rent. The allegations of the petition with respect to the making of the lease, the original entry and the possession by the tenant, and non-

payment of the rent were not denied by the answer, but the tenant denied that he still occupied the premises and alleged that he then only remained in possession of a portion of the premises, and denied that rent was due or owing or that he had made default in the payment of rent or continued in possession after such default; and for a separate defense the tenant reiterated the denials and pleaded the lease and alleged that before any rent became due or payable, the landlord wrongfully entered upon the premises and removed him from the rear portion on the northerly side thereof, " being a strip of ground 50 feet in length and 20 feet 6 inches wide, extending across the lot, and kept the said tenant out of possession continuously thereafter and still continues to keep said tenant out of the possession of said portion of said premises," and that without his consent the landlord removed a fence surrounding said portion of the premises and erected a building and that the portion of the premises so taken and built upon by the landlord constituted the greater portion of the rear yard of the demised premises and belonged thereto, and that at the time of said entry and removal of the fence and erection of the building by the landlord no rent was due, and that by reason of the premises no rent thereafter became due.   The lease was made on the 25th of January, 1919, and thereby the landlord leased to the tenant for a term of five years, commencing on the 1st of March, 1919, at the annual rental of $1,200, payable in advance in monthly installments of $100 each, the premises described as follows: " all that certain dwelling known and designated as number Three Hundred and Twenty Seven (327) West Thirtieth (30th) Street, in the City of New York, Borough of Manhattan." The description is in no manner enlarged by any other provision of the lease.   Throughout the lease, the premises are referred to as " the premises," " said premises," and " the demised premises; " and there are also references to " the building hereby leased " and to " the building."

The uncontroverted evidence shows that this house was built on the northerly line of West·Thirtieth street on the southeasterly corner of a lot and that on the southwesterly corner of the lot a church was erected, leaving a private alleyway, five or six feet wide, running back from the street between

the church and the house of the depth of the house and connecting with the yard in the rear of the house and of the church. The house was built to the easterly line of the lot and was twenty-two or twenty-three feet wide. Many years prior to the time the lease was made the landlord owned the entire premises and altered the church into a printing house and used it for that purpose and used the alleyway, which was kept closed by a locked gate at the street line, for taking in and out material, and used the yard in the rear of the dwelling and printing house for storage purposes in connection with its printing business. A fence extended around the easterly, northerly and westerly lines of the lot from the northeasterly corner of a shed built against the rear of the house to the northwesterly corner of the printing house. That fence and the buildings and the alley gate inclosed all of the premises not covered by the buildings. The employees of the landlord some years before had made a table for playing a game described by the witness as the Italian game of " boche," consisting of a deep bed of cinders extending eight or nine feet in width from the end of the alley at the northerly line of the house and from part of the northwesterly end of the house to the northerly line of the lot and had used the same for many years in playing the game by rolling wooden balls thereon from the northerly end of the alley and house to the northerly fence. The bed of cinders was supported on the easterly line by planks which the tenant claims constituted a fence inclosing the rear yard, to which there was access from the house through the shed; and he testified that this fence extended from the northwesterly corner of the house at some points two and at others three feet above the surface of the yard in the rear of the house; but the preponderance of the evidence is to the effect that it was not a fence and that its height was only sufficient to sustain the bed of cinders and that it afforded no obstacle to access from the alley to the yard in the rear of the house and that said yard was used by the landlord as its business required. There were three doors on the easterly side of the printing house, one opening onto the alley and the others toward the yard in the rear of the house and they were used to a considerable extent in connection with the landlord's business. There was also a

fire escape built on the easterly side of the printing house with a platform or bridge extending out for some distance and a stairway leading down into the yard in the rear of the house some seven or eight feet from the easterly side of the printing house. The evidence tends to show that to some extent the fire escape interfered with the playing of the game of boche by the employees and that they discontinued playing the game there before the defendant took possession. In the month of December before the lease was made the landlord had caused to be prepared by an architect and filed with the building department plans for the erection of a building in the yard in the rear of the dwelling house for storing rolls of paper and it erected the building according to the plans without alteration in the month of October after the tenant took possession of the house under the lease. The lease contains no reference to any *appurtenance*. Respondent claims, however, that it gave him the use of the yard in the rear of the house. He testified that he was looking for a house and saw a sign on this house and entered the printing house, where he met one McGuire, who showed him through the dwelling and the yard, which extended back from the house some fifty-five or fifty-eight feet, and two trees in the yard and where wash lines could be hung; that the house was twenty-two feet by forty-two feet in depth and access to the yard was had through the shed; that the yard was paved with stone flagging and that there was nothing in the yard with the exception of a pile of rubbish and it was inclosed by an easterly and a northerly fence and by a fence two or three feet in height on the west, the support of the bed of cinders to which reference has been made, and that there was no entrance to the yard excepting through the house; that he was a physician and had his office on the first floor and that before the building was erected in the rear he used the yard for hanging out wash on lines extending from the house to a fence in the rear and that after the erection of the building in the rear he was obliged to extend the wash line from the second story to the top of the new building and that the new building to a considerable extent shut off the northerly light which he required in using his instruments and particularly the microscope. McGuire, who showed respondent the

house and yard, was employed as a porter and it was not shown that he had any authority to represent the landlord with respect to the negotiations for the lease. The landlord, in making the lease, was represented by Mr. Dillon, its president. The tenant testified that his negotiations were with Dillon who informed him that they had thought of putting up a storage building in the rear of the yard but said nothing about building there in the future and that he was permitted thus to use the yard for hanging out wash until the middle of October and paid the rent due down to that time; that about the fifteenth of October some men appeared in the yard and began to tear down the fences and to dig, but upon his protest they desisted and then returned a day or two later and proceeded with the work, and that during the construction of the building he protested to Dillon that it was cutting off his light and air and rendering it impossible for him to use his instruments, but that the landlord proceeded and finished the construction, cutting off all of the rear yard excepting about ten by twelve feet thereof which was insufficient to hang out wash, and that the new building is twenty-five by forty-five feet and about sixteen feet high and reaches about half way above the level of the first parlor floor window of the dwelling and is twelve feet distant therefrom and was connected with the north wall of the house, and thereby noises and vibrations are increased and that the landlord has erected between its printing house and the new building an iron or steel runway on which rolls of paper are carried from the street to the new building, causing a continuous vibration and rumbling. The tenant testified that he had three interviews with Dillon and that his wife, who was not called as a witness, was present at one; that without any suggestion from Dillon he offered to allow the landlord to store paper in the basement of the house and when Dillon said they thought of erecting a storage building in the rear of the yard, he stated that if they ever needed storage space they could use the cellar of the house and that there was nothing stated to the effect that the lease described the house only because the landlord desired to use the yard. Dillon testified that at the first interview he informed the tenant that plans for the erection of the storage building in the rear had been filed

and that the tenant said that he did not care about the yard but wanted the house heated from the printing shop and that the installation of radiators essential for that purpose was made by the landlord at a cost of $700 and heat was so furnished; that he informed the tenant the reason he was letting the house so cheap was on account of the building to be erected in the yard in the rear and that at the second interview, when the tenant's wife was present, he asked if she had been informed that a building was to be erected in the rear and the tenant answered in the affirmative; that he also informed the tenant that the building would have been commenced before that time were it not for delay in getting the permit and that he informed the tenant with respect to the dimensions of the new building, and that the only complaint the tenant made when the building was being constructed was that it was larger and closer to the house than he had been informed; that when the lease was signed he drew the tenant's attention to the fact that it only covered the dwelling and that the tenant agreed that that was his understanding. With respect to the material part of these interviews, Dillon was corroborated by the testimony of his secretary, Miss Keyes. Other evidence offered by the landlord fairly established the fact that the landlord at all times had the use and control of the alleyway and that there was free access therefrom without obstruction by fence or otherwise to the open yard in the rear of the two buildings and that the landlord used the alleyway and that open space as its business required. The tenant denied that he stated to Dillon that he did not care about the yard and testified that nothing was said to the effect that he was not to have the yard and also denied that he stated to Dillon, in substance, that his only objection was that the building was too large and was too near the house.

I am of opinion that the lease did not give the tenant the use of the yard or preclude the landlord from building therein. Respondent makes no claim to the use of the alleyway which formed part of the open space around the building. His theory is that the yard was inclosed and that there was no access thereto excepting through the house. If that were so, the authorities cited (*People ex rel. Murphy* v. *Gedney,* 10 Hun,

151; *Doyle* v. *Lord*, 64 N. Y. 432, and *Cohen* v. *Newman*, 91 Misc. Rep. 561; affd., on dissenting opinion of MADDOX, J., 173 App. Div. 976) would tend to sustain his claim, but his theory is not sustained by the evidence. It is not only improbable that the landlord would have given the tenant the use of the yard when it had theretofore filed plans for the erection of a building therein, but the terms of the lease and the preponderance of the evidence show that such was not its intention. No entry by the landlord constituting an actual partial eviction which would entitle the tenant to remain in possession of the remainder of the premises without paying any rent (2 McAdam* Landl. & Ten. [4th ed.] 1385, § 406; *Christopher* v. *Austin*, 11 N. Y. 216; *Fifth Avenue Building Co.* v. *Kernochan*, 221 id. 370; *Lodge* v. *Martin*, 31 App. Div. 13), as he claims the right to do here, was shown, and it is well settled that even if there were a constructive eviction which here could be predicated only on the increase in the noise and vibrations and interference with light and air as to all or part only of the premises without an actual abandonment of the premises by the tenant, that would not be a defense to an action for rent. (2 McAdam Landl. & Ten. 1385, § 406; *Edgerton* v. *Page*, 20 N. Y. 281; *Boreel* v. *Lawton*, 90 id. 293.)

It follows, therefore, that the determination of the Appellate Term should be reversed, with costs, and the order of the Municipal Court reversed, with costs, and a final order granted as prayed for by the landlord.

CLARKE, P. J., SMITH, PAGE and MERRELL, JJ., concur.

Determination and order of Municipal Court reversed, with costs and disbursements in this court and in the Appellate Term, and final order granted as prayed for by petitioner, with costs.